J-S31021-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
MICHAEL DANIELS :
:
Appellant : No. 410 EDA 2024

Appeal from the Judgment of Sentence Entered June 29, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0006783-2018

BEFORE: BOWES, J., McLAUGHLIN, J., and BECK, J.

MEMORANDUM BY McLAUGHLIN, J.: **FILED NOVEMBER 6, 2024**

Michael Daniels appeals from the judgment of sentence entered following his convictions for unlawful contact with a minor, corrupting the morals of a minor, and indecent assault.[1] Daniels argues the evidence was insufficient. We affirm based on the trial court's opinion.

The trial court has given a full recounting of the evidence presented at Daniels' bench trial. *See* Trial Court Opinion, filed March 1, 2024, at 3-22. In short, the victim, V.E., testified that while she was 16 years old and working for 35-year-old Daniels as a lifeguard at a public swimming pool, Daniels inappropriately touched her buttocks, legs, and breasts, and kissed and licked her neck. The Commonwealth also presented the testimony of V.E.'s friend and V.E.'s mother.

---

[1] *See* 18 Pa.C.S.A. §§ 6318(a)(1), 6301(a)(1)(ii), and 3126(a)(1), respectively.

Following trial, the court convicted Daniels of the above crimes. It sentenced him to an aggregate of 11½ to 23 months' incarceration, followed by five years of sex offender probation. Daniels did not file any post-sentence motions. This timely appeal followed.[2]

Daniel challenges the sufficiency of the evidence. *See* Daniels' Br. at 8. He asserts,

(1) [V.E.]'s testimony was incredible as inconsistent with prior sworn testimony and statements, and witnesses' prior testimony and statements;

(2) there were no eyewitnesses to support any of the offenses;

(3) there was no physical evidence to corroborate the allegations; and

(4) the defendant testified credibly and consistently.

*Id.* at 16-17.

Daniels first argues the Commonwealth's evidence was inconsistent. He claims V.E. testified he touched her breasts two times, which contradicted her statement to the police that he had only attempted to touch her breasts. *Id.* at 17. Daniels further asserts V.E.'s testimony that she never used her phone at work contradicted her testimony that she once dropped her phone on a child's head while she was working. *Id.* He also asserts her testimony regarding their text messages differed from her preliminary hearing

_____

[2] We dismissed Daniels' first appeal after his counsel failed to file a brief. Daniels filed a *pro se* petition for post-conviction relief two months later. The court granted relief and reinstated Daniels' direct appeal rights on January 23, 2024. Daniels then filed a new, timely notice of appeal.

testimony. *Id.* Daniels further asserts V.E.'s testimony that he inappropriately touched her in the breakroom 10 times contradicted her mother's testimony that it only happened four to five times. *Id.* at 17-18. He also argues V.E. testified that the incident her friend had described in a statement to the police – where Daniels held V.E. on his lap in a car and was kissing her neck – never happened. *Id.* at 17.

Daniels next argues the evidence was not credible because the Commonwealth failed to provide any eyewitnesses to corroborate V.E.'s account. He emphasizes that V.E. testified that the assaults occurred at a big city pool, in the middle of summer, during daylight hours. *Id.* at 18. He points out that a co-worker testified that she never saw any incidents, even though she spent a significant amount of time in the breakroom where the alleged incidents occurred, the breakroom was visible from any location where she worked, and the breakroom door was always open. *Id.* He asserts three other co-workers also testified that they never saw him touch V.E. inappropriately on the pool deck and never saw the two of them enter or exit the breakroom together. *Id.* at 18, 19. Daniels further highlights the absence of physical evidence. *Id.* at 19-20. Finally, Daniels argues his own testimony was credible and consistent. *Id.*

Daniels states that "[t]his was a case that relied on impeaching and contradicting trial testimony of Commonwealth fact witnesses with prior statements and Preliminary Hearing testimony." *Id.* at 20. He concludes, "[T]he evidence presented was so contradictory and unbelievable that the

elements of the offenses were not made out and the verdict was insufficient as a matter of law." *Id.*

The trial court found this issue to be a veiled challenge to the weight of the evidence. It also found that Daniels waived his weight claim by failing to raise it below. *See* Trial Ct. Op. at 23-25.

We agree. A challenge to the sufficiency of evidence requires an assessment whether the evidence, in the light most favorable to the Commonwealth, establishes each material element of the crime charged beyond a reasonable doubt. *See Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000). If the evidence supporting the verdict "is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law." *Id.* The sufficiency of the evidence is a question of law and may be raised for the first time on appeal. *See id.*; *see also* Pa.R.Crim.P. 606(A)(7).

In contrast, a challenge to the weight of the evidence requires the trial court to assess whether "certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Widmer*, 744 A.2d at 752 (citation omitted). This issue must be presented to the trial court in the first instance, or it is waived. *See* Pa.R.Crim.P. 607(A) (providing that weight of the evidence claims shall be raised with the trial judge).

Here, Daniels' argument is that the evidence was not credible because it was allegedly contradictory in parts and lacked corroboration. Daniels does

not argue that the Commonwealth failed to set forth any evidence to establish each of the elements of the crimes charged. Nor does he claim that the evidence in support of the verdict was "in contradiction to the physical facts, in contravention to human experience and the laws of nature[.]" *Widmer*, 744 A.2d at 751. His argument therefore goes to the weight, and not the sufficiency, of the evidence. *See Commonwealth v. Juray*, 275 A.3d 1037, 1043 (Pa.Super. 2022) (stating that sufficiency review "does not include an assessment of [the] credibility of [the] testimony offered by the Commonwealth"). As Daniels did not raise his weight claim below, it is waived. *See Commonwealth v. Sherwood*, 982 A.2d 483, 494 (Pa. 2009).

Despite the defectiveness of Daniels' sufficiency argument, the trial court reviewed the evidence and found it was sufficient to establish each of the convictions. *See* Trial Ct. Op. at 27-29 (reviewing the elements of the charged crimes and finding that in the light most favorable to the Commonwealth, the evidence established Daniels "repeatedly communicated with V.E., both verbally and in writing, for the purpose of engaging in prohibited acts (sexual contact) with his minor victim" and that "on numerous occasions, [Daniels] fondled and touched V.E. inappropriately for his own sexual gratification and without her consent. Among other things, [Daniels] asked V.E. for hugs, pulled her onto his lap, fondled her breasts and buttocks, spanked her, and licked her neck").

We agree. We therefore affirm based on the trial court's opinion.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date:  11/06/2024

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA          :          CP-51-CR-0006783-2018
                                       :
                                       :
                                       :
VS.                                    :
                                       :
MICHAEL DANIELS                        :          1976 EDA 2022

**FILED**

OPINION

MAR - 1 2024

WOELPPER, DONNA, J.

Appeals/Post Trial
Office of Judicial Records

Michael Daniels ("Defendant") has appealed the Court's judgment of conviction and

sentence. The Court submits the following Opinion in accordance with the requirements of

Pa.R.A.P. 1925, and for the reasons set forth herein, recommends that its judgment be affirmed.

I.      PROCEDURAL HISTORY

On March 17, 2022, following a bench trial[1] before this Court, Defendant was convicted

of unlawful contact with a minor,[2] corrupting the morals of a minor,[3] and indecent assault.[4] [5]

Sentencing was deferred pending the completion of a presentence investigation ("PSI") report

and evaluation by the Sexual Offender Assessment Board ("SOAB"). On June 29, 2022, upon

consideration of the PSI report, sexual offender assessment, and all relevant facts and

circumstances of this case, the Court sentenced Defendant to an aggregate term of 11½ to 23

---

[1] This case was referred to and prosecuted by the Pennsylvania Office of Attorney General.

[2] 18 Pa.C.S. § 6318(a)(1).

[3] 18 Pa.C.S.§ 6301(a)(1)(ii).

[4] 18 Pa.C.S.§ 3126(a)(1).

[5] The Court acquitted Defendant of unlawful restraint and endangering the welfare of a child.

months' incarceration, followed by five years of sex offender probation.[6] The Court further ordered Defendant to stay away from the victim and to have no unsupervised contact with minors.

On August 1, 2022, Defendant filed a Notice of Appeal to the Superior Court.[7] On August 3, 2022, the Court ordered Defendant to file a Concise Statement of Matters Complained of on Appeal in accord with Pa.R.A.P. 1925(b). On August 24, 2022, counsel for Defendant timely filed a Rule 1925(b) Statement, raising a challenge to the weight of the evidence.

On October 31, 2022, the Court filed its Rule 1925(a) Opinion, in which it: (a) recommended quashal of Defendant's appeal due to his untimely Notice of Appeal; and (b) finding Defendant's weight of the evidence claim waived in any event due to his failure to preserve the claim pursuant to Pa.R.Crim.P. 607(A).

On January 6, 2023, the Superior Court entered an Order dismissing Defendant's appeal due to counsel's failure to file a brief. On March 27, 2023, Defendant filed a pro se Post Conviction Relief Act[8] ("PCRA") petition. PCRA counsel was appointed, and on October 6, 2023, he filed an amended petition, seeking reinstatement of Defendant's post-sentence and direct appeal rights nunc pro tunc on the basis of, inter alia, prior counsel's failure to file post-sentence motions or an appellate brief.

On November 8, 2023, the Commonwealth filed a response to Defendant's amended petition, consenting to reinstatement of Defendant's direct appeal rights, but opposing such relief

---

[6] The SOAB determined that Defendant did not meet the criteria for classification as a sexually violent predator.

[7] Defendant filed his Notice of Appeal two (2) days beyond the 30-day time limit.

[8] 42 Pa.C.S. § 9541 et seq.

as to his post-sentence motion due to lack of prejudice, i.e., the post-sentence motion would have been futile. On January 23, 2024, the Court entered an Order reinstating Defendant's direct appeal rights nunc pro tunc.

On January 25, 2024, Defendant filed a Notice of Appeal to the Superior Court. On January 26, 2024, the Court ordered Defendant to file a Rule 1925(b) Statement of Matters Complained of on Appeal. On February 14, 2024, counsel for Defendant timely complied.

II.    FACTUAL HISTORY

At trial, the Commonwealth first presented the testimony of Leah Sax. Ms. Sax testified that during the summer of 2018, her lifelong friend and lacrosse teammate, V.E., had told her that her boss at the public pool where she worked (i.e., Defendant) was "creepy and weird." During the first week of August, Ms. Sax's family rented a beach house in Sea Isle, New Jersey, and V.E. and a couple other friends stayed with them that week. Ms. Sax noticed that V.E. was wearing shorts over her bathing suit at the beach, so she asked her why, but V.E. did not answer. Ms. Sax then observed "slice marks on her leg," which she "recognized as [V.E.] cutting herself." Ms. Sax asked V.E. why she did that: "And she just told me that she didn't know why, and she was just feeling really upset, and that was the only thing she could do. And she left it at that." Ms. Sax told V.E. that she was there for her, and would help if she needed it, and if she didn't want to tell her what she was going through, that was okay, too. (N.T. 12/27/21 at 26-29).

Ms. Sax testified that on the following day, when they were back in Philadelphia, she received Snapchat texts from V.E. explaining what she was going through with her boss at the pool. Specifically, V.E. confided: Defendant made her sit on his lap; he told her that if she didn't kiss him or show him her boobs, she would have to sit in the lifeguard stand all day; he would approach her in the office every morning and say, "Where's my good morning kiss?";

3

Defendant would kiss her on the neck; he would touch her boobs; he would touch her legs; and he would put his hands up her shorts. ( N.T. 12/27/21 at 29-32; Exhibit "C-1").

Ms. Sax testified that she confided the above information to her mother. As a result of that conversation, Ms. Sax advised V.E. that she needed to talk with her parents about what was going on at work. A couple weeks later, on August 22, 2018, Ms. Sax provided a detailed police statement at the Special Victims Unit. Ms. Sax confirmed the accuracy of her police statement, which was submitted into evidence as Exhibit "C-2". (N.T. 12/27/21 at 33-37; Exhibit "C-2").

The Commonwealth next called V.E. to the stand. V.E. testified that in July 2018, she was 16 years old and working as a lifeguard at Kelly Pool in Philadelphia. She worked with Defendant, who was the head lifeguard, and her supervisor, at the pool. V.E., along with several other junior lifeguards, commenced working at the pool on July 16, 2018. On the first day of work, she was introduced to Defendant, who obtained her phone number, and provided his phone number to her (and the other lifeguards) for "communication." As they were exchanging contact information, Defendant asked V.E. if she was 18, and she responded that she was 16. Defendant also asked her, "Are you about that life?" -- which she "had no idea what he was talking about." (N.T. 03/17/22 at 4-10).

V.E. testified that, later that same night at 9:14 p.m., Defendant texted her, "Hey," to which she responded, "Hey." Defendant replied, "Wyd," which means "what are you doing?" V.E. did not reply again until 11 p.m., at which point she said, "just got home." Defendant said, "Damn, where you go? LOL." Defendant then tried to call V.E. on the phone, but she did not answer. She told him, "My calls don't work." During the trial, the following questions were asked and answered:

4

Q.      What did he reply when you said that the phone was broken?

A.      "How do I know this is you, really you?  LOL." And then I said, "LOL, I don't know.  Cuz I called you at the pool."

Q.      What did he reply?

A.      "Okay, LOL.  What did I have on today?  LOL, what are you doing?"  Then I said, "Red shirt," and I was watching TV.  And he said, "And you take forever to text back.  Can you come out?"

I said, "Not now.  I got people over."  That was not true.  I just said that because I didn't want to do that.

Then he said, "LOL.  Send me a pic.  And so you say you about that life, huh?"  Then I said, "Yeah, maybe." I still didn't know what he was talking about.

And then he said, "Oh, now it's maybe, ha, ha, ha."  And then I said, "LOL."  And he said, "Where my pic at?"  I said, "Of what?"  He said, "You."  So I sent -- I guess you can't really see this picture of me [in Exhibit "C-1"], but it was like a selfie of me and my friend.  It was just in my camera roll from a while ago, that I just -- I sent that to make it seem like I was with friends.

Q.      So, you sent him a picture, a fake picture, basically?

A.      Yeah, it was a picture from not at that time.

Q.      Okay.  And after you sent the picture, did he reply back?

A.      Yeah.  He replied the next morning, "LOL.  Who that?"  And then, Good morning, "GM."

        *       *       *

Q.      Were you working that day?

A.      I believe so, yes.

5

Q.	So, was he texting you before you went to work or at some other point?

A.	Like he texted like the day before, was my first day, and then this was my second day, he texted me in the morning before I got to work.

Q.	Okay. After he said good morning, did you reply?

A.	Yes. I said, "My friend LOL." And I said, "I'm late," because I was late to the pool.

Q.	He said, "It's okay. You were hella late. LOL."

And I said, "LOL." Then he said, "What are you doing? And you never answered my question."

And I said, "What question?" And he said, "You said you about that life and I said are you sure, and you said yup, so what life are you about. And don't be shy and not want to answer the question."

And I didn't know what to say to that, so I said ["]dot, dot, dot, and I'm at work."

Q.	What's the next text mean?

A.	Where are you at.

Q.	Okay. And what did he reply?

A.	He said, "On my way. What's wrong?" And then, ["]What's Inaya's number?"

Q.	Who is Naya?

A.	Inaya, she was another lifeguard at the pool.

Q.	Did you provide that?

A.	Yes.

(N.T. 03/17/22 at 11-15).

6

V.E. testified that during the first week of work, Defendant took her and Inaya in his car to get some charcoal for the grill at the pool. It was raining that day, so they did not have to return to the pool. Defendant dropped off Inaya at her house, which left V.E. alone with Defendant in his car. Defendant then started playing love songs and singing the lyrics as he looked at V.E. This made her feel "super uncomfortable," so she came up with an excuse to get away from Defendant:

> So I was like, okay, I have to go home, I forgot. He said, "I can drive you home." I said, "No, that's fine. I'm getting out."

> *     *     *

> Q. What was he singing in the car?

> A. Like love songs, yeah.

> Q. And did he say anything while you were in the car with him?

> A. Yeah. He was -- I don't know what he said. I just remember him looking at me and then singing the love songs.

> Q. When you got out of the car, did you Uber home yourself or did you go back to work? What did --

> A. Yeah, I just Ubered home. I don't know even where we were. I just wanted to get out.

> Q. So, did you ask him to pull over and you got out of the car?

> A. Yes. I said, "Oh, my mom needs me home right now. I have to go right now."

> Q. Up until that point when you got out of the car, had he ever touched you?

> A. No.

(N.T. 03/17/22 at 16-18).

7

V.E. testified that, after that car ride, Defendant started making unwanted physical contact with her. Specifically, Defendant would walk up behind her on the pool deck and "touch or grab [her] butt," and touch her legs while she was sitting in the lifeguard stand. It escalated from there::

> Q. Did it ever go beyond that?
>
> A. Yes. There was -- I think the first time -- so there's a break room at the pool, and it's just like a little building, it's one room. And you can't really see into it, but the lifeguards take their breaks in there, eat lunch in there. And one time, he called me in there ... and he was like, "You weren't scanning the pool enough," I wasn't doing something right. "You need punishment," and he spanked me not like hard, but -- and there were other incidents in there.
>
> Q. In the break room he said you weren't scanning the pool right, and he spanked you?
>
> A. Yes.
>
> Q. Where did he hit you?
>
> A. On my butt.
>
> Q. Was it hard or --
>
> A. No, it wasn't hard.
>
> Q. Okay. What other incidents can you tell the judge about?
>
> A. There were other times I would be sitting in there, and he would come in and be like, "Where's my hug?" And I would just sit there, not respond. And he would like pull me up out of my chair and hug me and grab my butt ... and like, just like feel up my body.
>
> And then other times, he would pull me onto his lap, like hold me on his lap and feel up my legs and my butt and like the rest of my body.

8

Q.   Now, when he would do this, what was it over or under your clothes?

A.   So, I'd be wearing a swimsuit and the shirt and shorts, usually.  So, he would go under the clothes, but not usually under the swimsuit.

Q.   How did you feel when he was doing this to you?

A.   Extremely uncomfortable, not wanting the interaction.  I would -- like I would never go willingly, I guess, but yeah.

Q.   And then what else would he do?

A.   He tried to grab my boob.  He did grab my boob and felt my breasts.

Q.   Tell the judge when and where that occurred.

A.   In the break room also, and while he was in a hug, or while I was on his lap, he would be holding me on his lap; yeah.

He also kissed my neck like one time, like licked my neck while we were hugging.

Q.   Did you ever ask him to do any of these things?

A.   No, no.

Q.   When over [*sic*] what period of time was this happening?

A.   Like, I think I worked there for like four weeks, so the four weeks that I worked there.

(N.T. 03/17/22 at 18-21).

V.E. testified that she kept a journal regarding the above incidents in the Notes app on her phone, which she preserved.  V.E.'s journal entries were submitted into evidence as Exhibit "C-5."  She testified that as a result of these incidents, she became "super depressed" that summer and began cutting herself on her legs.  In early August, she confided the above incidents to her

9

friend, Leah Sax. V.E. sent Leah long snapchat texts describing the incidents, and Leah responded, "This is abuse, like tell someone, tell your mom." In the second-to-last week of August, on the first day of soccer practice, V.E.'s mother noticed the cuts on her legs and "freaked out, understandably." V.E. then told her mom what Defendant did to her at the pool. Following this conversation, V.E. and her mom went to the police with Leah and her mom to file a police report. (N.T. 03/17/22 at 21-31; Exhibits "C-1," "C-3" & "C-5").

On cross-examination, counsel for Defendant attempted to impeach V.E. by referencing her testimony at the preliminary hearing. Specifically, defense counsel presented her testimony that Defendant asked V.E. her age on the second day as opposed to the first day of work, and that after he learned her age, he stopped texting her. However, V.E. explained that she was not sure whether it was the first or second day, and noted the same at the preliminary hearing. Further, regardless of which day it was, V.E. was certain that Defendant texted her the same night he obtained her phone number. (N.T. 03/17/22 at 32-36).

Defense counsel also questioned V.E. about the numerous incidents in which Defendant touched her legs and butt while she was in the lifeguard stand and on the pool deck. Specifically, counsel asked how this could have occurred in public with people and other lifeguards around without anyone saying, "Oh, my gosh. Why did he do that?" V.E. answered, "I don't think anybody could really see. It wasn't like a long -- it was just me walking, and he'd be walking behind me and like reach his hand up quickly." (N.T. 03/17/22 at 38-40).

Additionally, defense counsel questioned V.E. about the incidents inside the break room. Specifically, counsel pointed out that V.E. testified on direct examination that Defendant had "touched her boob," whereas in her police statement, she said that Defendant "tried to grab [her] boob." V.E. explained that Defendant tried to grab her boob, prompting her to push his hand

10

away, but he would try again and successfully touch her breast. V.E. also noted that, at the preliminary hearing, she testified that "he did touch my boob." (N.T. 03/17/22 at 41-44).

On redirect examination, V.E. was asked to address the inquiries by defense counsel on cross-examination. Specifically:

> Q. You still have [Exhibit] C-6 in front of you? … It's the Preliminary Hearing.
>
> A. Yes.
>
> Q. I'd like you to go to Page 25.
>
> A. Yes.
>
> Q. Do you recall being asked -- hold on, one moment, Judge. Beginning with 24. … Counsel was asking you about questions [beginning] on Line 13. "Then the next day, he found [out] your age, correct? Answer. Yes."
>
> That's what counsel just read to you, correct?
>
> A. Yes.
>
> Q. "Question. Okay. There was no further [text] communications after that; is that fair? Answer. Yes."
>
> He read that one to you --
>
> A. Yes.
>
> Q. -- also correct?
>
> Next question on Page 24, "Question. So just to be clear, he didn't text you at all after he found out what your age was; is that correct? Answer. No. He asked me my age the same day like he got my phone number."
>
> So, am I correct that you told the judge at the Preliminary Hearing the same day you gave him the phone number, you gave him your age?
>
> A. Yes.

11

Q. Very next page, Line 5. "So when you testified that he found out your age the second day, do you remember that? Was that a mistake? Answer. I guess so."

"Question. You guess so? Answer. I just remember I'm not exactly sure if it was the first or second day. I just knew he asked my age and my phone number in the same conversation."

A. Yeah.

Q. And was that the day, that night, the day he started asking you repeatedly if you were about that life?

A. Yes.

Q. Did he ask you that in person before --

A. Yes, in the same -- yeah, in the same conversation where he asked [for] my phone [number] and if I was 18, he asked if I was about that life."

Q. So that was out loud?

A. Yes.

Q. Not over a phone?

A. Yes.

Q. As a matter of fact, he mentioned that in the text message, "You never answered my question before" --

A. Yes.

Q. -- "are you about that life?"

A. Yes.

(N.T. 03/17/22 at 55-57).

V.E. further addressed Defendant's suggestion on cross-examination that she only just recently "fabricated" the journal notes in her phone. Specifically -- putting aside V.E.'s offer to

12

display her phone at trial to demonstrate that the notes were written in July and August 2018, which offer defense counsel declined -- V.E. testified that the notes in her phone were included *verbatim* in her August 2018 statement to detectives, and thus could not possibly have been entered after the fact:

> Q.     I would like you to compare Page 18 [of Exhibit "C-1"] to the messages that you retrieved from your phone, specifically at [Exhibit] C-5, Page 2.
>
> A.     Okay.
>
> Q.     Would you agree that on Page 18 of C-1, about the fourth line down, what you gave the detectives on August 22nd [of 2018] is you saying about [*sic*] what happened. Then, you said, kidding, but I don't know. He came over and grabbed my arm and like dragged me over. I didn't really protest. I just kept sitting on the chair, and he dragged it across the room. Why don't I just hit him away? He put me in his lap. I tried to get up, and he held me there, grabbed my boob. I moved his hands. He said my nipples were hard -- was hard. Sitting on me makes your nipples hard. I said no. He said,, "You thinking about Cain?" I said no. He tried to lift my shirt. I moved his hand. He said, "Come on, just the bathing suit." I said no. He put his hand all up my shorts. I moved it, but he kept putting it there, rubbing around and shit.
>
> Did I read that accurately? Is that from the text [screen shot] that you gave Detective Gage when you gave your statement to the police?
>
> A.     Yes.
>
> Q.     And is that the same language that's on Page 2 of the exhibits you sent me the other day?
>
> A.     Yes.
>
> *     *     *
>
> Q.     [At which time the Assistant D.A. recited Page 2 of Exhibit "C-5"]

13

Would you agree that's the same exact language that was in [the statement] you gave the detective?

A.    Yes.

Q.    So, did you, in fact, give the detective the same note back in August [the 22nd] of 2018 that you gave me this week?

A.    Yes.

(N.T. 03/17/22 at 57-63).

The Commonwealth next presented the testimony of V.E.'s mother, S.E. S.E. testified that, in mid-July 2018, her daughter started working at Kelly Pool in Philadelphia; she was 16 years old at the time and had just completed her sophomore year of high school. Over the next few weeks, S.E. noticed that V.E. appeared "very grouchy and seemed a little depressed." S.E., who is a psychologist, chalked it up as adolescent grouchiness. On August 20, 2018, S.E. noticed cut marks on V.E.'s legs while S.E. was giving her a driving lesson. S.E. asked her what the cut marks were, and V.E. said she "didn't want to talk about it." When they arrived home, S.E. said, "You know, we really need to talk about this. This is serious. … if something is going on that is giving you this much distress, we really need to talk about it." S.E. then gave V.E. some space; V.E. sat on the couch while S.E. went upstairs. When S.E. came back downstairs, V.E. was crying and said, "Mom, I need to tell you something." (N.T. 03/17/22 at 76-80).

S.E. testified that V.E. proceeded to tell her about the incidents at the pool. V.E. told her that, on multiple occasions, Defendant pulled her onto his lap and fondled her. S.E. asked her if Defendant had penetrated her, and S.E. said, "[N]o, it was over the clothing, [and] he had tried to go under the clothing, but she had pushed him." V.E. "also expressed that she felt like, oh, I could have screamed, I should have done something more. … She was internalizing, you know, oh maybe it was my fault because I didn't protest enough." S.E. told V.E., "It's not your fault.

14

He's 35 years old. You're a child. You're a teenager, a minor. It's not your fault." (N.T. 03/17/22 at 80-81).

S.E. testified that, as a psychologist, she is a mandated reporter of sexual abuse/child abuse, so she knew she had to report this. S.E. sat down with V.E. to try to trace a timeline of the incidents. V.E. told her that she could not remember everything, but that "she had both texted her friend, Leah, about some of these things, and that she had taken diary notes on her phone." They wrote down a timeline of the incidents based on the notes and texts on V.E.'s phone, as well as her recollection. On the following morning, V.E. called ChildLine to report the above events. On the ensuing day, August 22, 2018, S.E. and V.E. went to the police station to file a police report. V.E. provided her phone to detectives, who took screenshots of her texts and notes, before taking detailed statements from V.E. and S.E.[9] S.E. reviewed her police statement (submitted into evidence as Exhibit "C-4") and confirmed its accuracy. (N.T. 03/17/22 at 81-93; Exhibit "C-4").

On cross-examination, counsel asked S.E. to reconcile her statement to police that V.E. told her Defendant had touched her inappropriately "four or five times" in the break room, versus V.E.'s testimony that there were "ten" such incidents in the break room. S.E. testified that she provided her statement four years ago and she was "very upset" at the time. However, she acknowledged that if V.E. had told her "four or five times," then that's what she would have provided in her statement. (N.T. 03/17/22 at 93-95).

Prior to resting, the Commonwealth introduced the following stipulated evidence:

> Your Honor, if Detective Jenkins were to testify, he would testify
> that he was the partner of Detective Kevin Gage; that he worked
> the case involving -- the alleged incident[s] involving the victim,

---

[9] As previously noted, Leah Sax and her mother accompanied S.E. and V.E. to the police station, and Leah provided her phone and a statement to police.

15

[V.E.]; that the witnesses came to the Special Victims Unit on August the 22nd, and statements were taken from [S.E.], the mother, by Detective Jenkins, and [V.E.] and Leah Sax by Detective Gage; that they obtained information from the cell phone, which was returned to the family; that pursuant to their investigation they issued an arrest warrant for the defendant....

\*　　\*　　\*

Your Honor, the detective would testify that he reached out to -- that detectives contacted the defendant about the warrant on August the 31st; that he then surrendered himself on September the 10th of 2018, and during processing, indicated his date of birth was 7/13/83, giving him the age of 35 at the time of the incident, at the time of the arrest.

(N.T. 03/17/22 at 97-98).

For his case-in-chief, Defendant first called his co-worker, Brenda Rorie to the stand. Ms. Rorie testified that, in July and August 2018, she worked at Kelly Pool as a maintenance assistant. Her job required her to take care of the pools, the grounds, and the offices between the hours of 7:00 a.m. to 3:30 p.m. Ms. Rorie remembered [V.E.] as a lifeguard at the pool, although she did not know her name. Ms. Rorie testified that she saw V.E. "practically every day she worked," never saw Defendant do anything inappropriate with V.E. during the hours that she worked, and never saw Defendant alone in the break room with V.E. (N.T. 03/17/22 at 100-103).

On cross-examination, Ms. Rorie admitted that her job responsibilities required her to clean the bathrooms, and to monitor areas outside the break room. Ms. Rorie also testified that Defendant -- who had been her colleague for 13 years -- oversaw at least 10 lifeguards, not all of whom would be outside at the same time. Rather, some of them would be in the break room, which is relatively quiet compared to the pool deck, and Defendant had access to that area. (N.T. 03/17/22 at 103-111).

16

Defendant next presented the testimony of Daisha Wright. Ms. Wright testified that, during the summer of 2018, she worked as a Lifeguard 1 at Kelly Pool. She had worked there with Defendant since the summer of 2016. Ms. Wright testified that she did not see Defendant do anything inappropriate with V.E., and did not see him alone in the break room with her. However, she did see V.E. on her phone while on duty as a lifeguard multiple times. On one occasion, V.E. was sitting in a chair above swimmers, when she leaned forward and dropped her phone on a girl's head. According to Ms. Wright, Defendant approached V.E. and reprimanded her for having her phone on the pool deck. Defendant "told her she won't be back next year, and that was it." (N.T. 03/17/22 at 112-116).

On cross-examination, Ms. Wright admitted that, when you are on the pool deck, you cannot see who is in the break room. Ms. Wright also testified that she started lifeguarding when she was 16 years old, and admitted to having a close relationship with Defendant outside of work:

> Q. Did you have any kind of relationship [with Defendant] outside of the job?
>
> A. Yes. Me and him is [sic] like brother and sister, you know, like we like we [sic] grew a close bond.
>
> Q. So, even though he was your boss, your supervisor, you being a Guard 1 and he's a Guard 2, you were friendly, socializing with him outside of the job; am I correct?
>
> A. Yes, sometimes.
>
> Q. So, he was not just your boss, he was your friend, right?
>
> A. Yes.

(N.T. 03/17/22 at 116-118).

17

Next, Defendant called Inaya Mander to the stand. Ms. Mander testified that she started working with Defendant at Kelly Pool in the summer of 2017. She returned as a Lifeguard 1 in the summer of 2018, during which time she worked with V.E. Ms. Mander testified that she never saw Defendant inappropriately touch V.E., and never saw him alone in the break room with her. Finally, Ms. Mander recalled an incident in which V.E.'s phone slipped out of her hand and hit a child on the pool deck. (N.T. 03/17/22 at 122-125).

On cross-examination, Ms. Mander testified that the break room is an area of refuge for lifeguards to get out of the sun, to use the bathroom, or get something to eat. Ms. Mander admitted that all lifeguards get to use the break room, and from most areas of the pool deck, you cannot see into the break room. Finally, Ms. Mander recalled an occasion when Defendant took her and V.E. in his personal car, and he dropped Ms. Mander off at her house, which left V.E. and Defendant alone in his car. (N.T. 03/17/22 at 125-131).

Defendant next presented the testimony of Ajamu Wilson. Mr. Wilson testified that, in the summer of 2018, he was in his second year of working as Defendant's supervisor at Kelly Pool. Mr. Wilson described his job responsibilities as general supervisor of the pool. He made sure "everything at the pool is okay," including scheduling/staffing, work stations, the pool water, and the overall environment. Mr. Wilson testified that he remembered V.E. from the summer of 2018, and at no point did he ever see Defendant touch her inappropriately. Nor did he ever see Defendant alone with V.E. in the break room, or walk out of the break room together. Mr. Wilson testified that when V.E. was just starting out, he told her that she has to stay focused on the water. Other than that initial interaction, Mr. Wilson "never had an issue with any of her performance." (N.T. 03/17/22 at 132-137, 143).

18

On cross-examination, Mr. Wilson testified that if he knew that Defendant was trying to flirt or make a date with a younger/junior lifeguard, he would find it inappropriate. As he put it, "We [supervisors] don't fraternize -- you know you're not supposed to do that period. So we just -- I think we were instructed not to fraternize with co-workers." Mr. Wilson further testified that, as the "site supervisor," he rarely was inside the break room; rather, he mainly was outside walking the grounds of the pool, making sure that employees were doing their jobs and the facilities were safe and clean. (N.T. 03/17/22 at 137-143).

Defendant next called Philadelphia Police Sergeant Kenyatta Brandon to the stand. Sergeant Brandon testified that, in July and August 2018, he was stationed at Kelly Pool to provide a police presence. Sergeant Brandon did not recall being approached by V.E. to report that Defendant inappropriately touched her. However, he did recall Defendant approaching him to report an incident involving a male inappropriately touching a female in the pool. (N.T. 03/17/22 at 144-146).

On cross-examination, Sergeant Brandon testified that he had worked at Kelly Pool for three summers, namely, 2017, 2018 and 2019. He admitted that he did not know when or even which year Defendant had approached him about the inappropriate touching incident. Additionally, Sergeant Brandon testified that the alleged culprit of the touching incident was a patron of the pool, not an employee. (N.T. 03/17/22 at 147).

Finally, Defendant took the stand in his own defense. Defendant testified that he was a Lifeguard 2 at Kelly Pool in the summer of 2018, which was his twelfth year at the pool. Defendant recalled that V.E. started working at the pool on July 16, 2018, on which date "she got all of our phone numbers." Later that same night, Defendant started texting V.E. He testified that he did not know she was 16 years old; instead, due to "the way she carried herself [and] the

19

language she used, he thought she was "over the age of 16." On the following day, July 17, 2018, the lifeguards "were all actually supposed to go out that night" -- but before they did, Daisha [Wright] told Defendant that V.E. "was only 16." Defendant testified, "[T]hat's when I stopped all communication." (N.T. 03/17/22 at 150-153; Exhibit "C-1").

Defendant also testified that Kelly Pool was the largest public pool in the City of Philadelphia, and on a typical day, there were 300 people in the pool. According to Defendant, he had to say something to V.E. virtually every day he saw her due to performance issues. On one occasion, he saw V.E. "slouched back in the chair, laying sideways on her phone," which prompted him to yell at her:

> I did yell at her. "[V.E.] what are you doing? So -- and she was startled and dropped her phone on the child's head. I did tell her this is why you shouldn't have phones on the pool deck. This is why it's not allowed.

(N.T. 03/17/22 at 153-154, 157-158).

Defendant further testified that, at the end of the summer, he and Mr. Wilson presented the junior lifeguards with their performance reports. Defendant presented V.E.'s report to her, and "the last thing [he] said to [her] was, "You probably won't be back here next year. This pool is just not, you know, a fit for you." According to Defendant, V.E. was angered over this, and responded, "[W]hy, you know, it'll get better." Finally, Defendant testified that he never grabbed V.E.'s butt, he never grabbed her breasts, he never kissed her neck, and never touched her inappropriately. (N.T. 03/17/22 at 159-160).

On cross-examination, Defendant acknowledged hearing his supervisor Mr. Wilson's testimony that fraternizing with co-workers at the pool was discouraged, but he disagreed with it: "I wouldn't say it's frowned upon. They actually encourage everybody to have, you know,

20

friendly relationships." When asked how old he thought V.E. was on July 16th, Defendant answered, "[S]he did not appear to be 16 years old." Defendant acknowledged that he was 35 years old at the time he asked 16-year-old [V.E.], "Are you about that life?" Defendant then tried to explain what he meant by "that life":

> So, when someone says, "Are you about that life?" I was basically, you know, referring to, you know, Kelly's Pool is one of the -- how can I say it? It's one of the pools where a lot of incidents happen, you know. We get a lot of rowdy patrons, people, you know, that just don't listen.
>
> And I actually made the comment, because on the first day, you know, after myself and [Mr. Wilson] told [V.E.] what her job duties were, I think someone dove in the shallow end, and, you know, I told [V.E.] -- I'm like, "Blow your whistle. Tell him to stop." And she was like, "No. Can you do it?" I'm like, you ain't about this life."
>
> That's where that came from.

(N.T. 03/17/22 at 160-163).

Defendant acknowledged that he started texting V.E. at 9:14 p.m. that night, asking her "What are you doing?" and "Can you come out?" Defendant claimed that he texted her this because "we were all supposed to go out that night" -- even though a few minutes earlier, he testified that they were all going out the following night, July 17th. Defendant also acknowledged asking V.E. to send him a photo of her, but claimed that he wanted to add it to his "contacts" so he would "know who's calling" -- even though her name would display by virtue of being in his contacts. (N.T. 03/17/22 at 163-165).

Defendant also attempted to explain why he texted V.E. on the following day, again asking her if she was "about that life":

> Q.  The next day. ... You ask her, "What are you doing? You never answered my question?" Answer: "What

21

question?" "You said you were about that life, and I said are you sure and you said yup. So what life are you about? What are you doing?

A.     Same thing I told you earlier.

Q.     Later on, the next message, you say, "And don't be shy and not want to answer the question."

A.     Yes.

Q.     If that was a lifeguard question, why would she be shy about answering that kind of question?

A.     As I said earlier, when we told her her job duties, she acted shy and asked myself, "Can you tell him not to dive in the pool?" And I said, "No, that's your job. You tell him." And again, that's why I said, "You're not about this life."

(N.T. 03/17/22 at 165-166; Exhibit "C-1").

Finally, Defendant admitted that he was singing "R & B" songs when V.E. was in his car.

However, he denied that he was singing to *her*:

Q.     And were you singing to her?

A.     I sing period. I wasn't singing to her; in general. I just sing period.

*          *          *

Q.     Okay. And you continued to sing -- were they love songs?

A.     They were just regular songs that come on the radio.

Q.     Okay.

A.     You can only sing rhythm and blues. You can't sing rap songs.

(N.T. 03/17/22 at 166-167).

22

Upon consideration of the above evidence, this Court, sitting as factfinder and assessor of credibility, found Defendant guilty of unlawful contact with a minor, corrupting the morals of a minor, and indecent assault. On June 29, 2022, the Court imposed sentence as previously set forth. This appeal followed.

III.   ISSUE ON APPEAL

Defendant raises the following issue in his Rule 1925(b) Statement:

> [Whether] [t]he evidence was insufficient as a matter of law as to the charges of unlawful contact with a minor, corrupting the morals of a minor, and indecent assault. The complainant, V.E.'s testimony was incredible, inconsistent with prior statements and sworn testimony and inconsistent with other witnesses' testimony and prior statements. There were no eyewitnesses presented to support any of the offenses. There was no physical evidence to corroborate the allegations. The defendant testified credibly and consistently.

(Defendant's Rule 1925(b) Statement, 02/14/24, ¶ 1).

IV.   DISCUSSION

Defendant claims that the evidence was "insufficient" to sustain his convictions. This claim is without merit.

At the outset, it appears that Defendant is attempting to backdoor his previous (waived) weight of the evidence claim by restyling it as a "sufficiency" challenge. More specifically, Defendant set forth the following claim in his prior Rule 1925(b) Statement, which the Court found waived:

> [Whether] [t]he trial court erred in not granting a new trial as the weight of the evidence should have resulted in an acquittal of all charges. The verdict was contrary to the evidence as: V.E.'s evidence was incredible, inconsistent with prior statements and sworn testimony, and inconsistent with the other witnesses' testimony and prior statements; there were no eyewitness[es] to support the alleged offenses; there was no physical evidence to

23

corroborate the allegations; and Defendant testified credibly and consistently.

(Defendant's Rule 1925(b) Statement, 08/24/22, ¶ 1; see Trial Ct. Op., 10/31/22 at 2-3).

In fact, the only substantive difference between Defendant's current claim and his previous (waived) claim is the assertion that "[t]he evidence was insufficient as a matter of law." Compare Defendant's Rule 1925(b) Statement, 02/24/24, ¶ 1, with Defendant's Rule 1925(b) Statement, 08/24/22, ¶ 1). Indeed, all of Defendant's arguments pertain to the credibility of the complainant, her alleged inconsistent statements/ testimony, the lack of corroborating evidence to support her testimony, and the credibility and consistent testimony of Defendant. In other words, he is actually asserting a weight of the evidence claim, which as previously noted, is waived for failure to present it to this Court in accordance with Pa.R.Crim.P. 907(A) (weight of the evidence claims "shall be raised with the trial judge" via written or oral (on-record) motion any time before sentencing, or in a post-sentence motion).

The distinction between weight and sufficiency claims is not without significance. In Commonwealth v. Widmer, 744 A.2d 745 (Pa. 2000), the Pennsylvania Supreme Court highlighted the distinction between a challenge to the sufficiency of the evidence, which contests the quantity of the evidence presented at trial, and a challenge to the weight of the evidence, which attacks the quality of that evidence:

> The distinction between these two challenges is critical. A claim challenging the sufficiency of the evidence, if granted, would preclude retrial under the double jeopardy provisions of the Fifth Amendment to the United States Constitution, and Article I, Section 10 of the Pennsylvania Constitution, whereas a claim challenging the weight of the evidence if granted would permit a second trial.
>
> A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict

24

when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

Widmer, 744 A.2d at 751-752 (citations, footnote, and quotation marks omitted).

Here, Defendant styles his claim as a sufficiency challenge, but advances arguments as to the weight of the evidence. Thus, regardless of its title, it is in fact a weight claim, which for the reasons previously expressed, is waived. Moreover, in stark contrast to a sufficiency challenge, a weight claim "**concedes that there is sufficient evidence** to sustain the verdict." Id. at 751 (emphasis added). As such, Defendant's claim is utterly intractable.

Further, even if he had properly presented a sufficiency challenge, Defendant would be due no relief as the evidence amply supported each of his convictions.

25

## A.       Sufficiency Standard

In evaluating a challenge to the sufficiency of the evidence, a reviewing court must view the evidence in the light most favorable to the Commonwealth as verdict winner. It accepts as true all the evidence, direct and circumstantial, and all reasonable inferences arising therefrom upon which the finder of fact could properly have based its verdict, in determining whether the evidence and inferences are sufficient to support the challenged conviction. Commonwealth v. Carroll, 507 A.2d 819, 820 (Pa. 1986); Commonwealth v. Griscavage, 517 A.2d 1256, 1259 (Pa. 1986); Commonwealth v. Hopkins, 747 A.2d 910, 913 (Pa. Super. 2000).

"[T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." Commonwealth v. Jones, 874 A.2d 108, 120 (Pa. Super. 2005); see Commonwealth v. Rippy, 732 A.2d 1216, 1218-1219 (Pa. Super. 1999) (while conviction must be based on more than mere speculation, "the Commonwealth need not establish guilt to a mathematical certainty"). "Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." Commonwealth v. Hutchinson, 947 A.2d 800, 806 (Pa. Super. 2008); see also Commonwealth v. Sneddon, 738 A.2d 1026, 1027 (Pa. Super. 1999).

"The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." Commonwealth v. Jones, 874 A.2d at 120. Thus, the decision of the trier of fact will not be disturbed where there is support for the verdict in the record. Commonwealth v. Bachert, 453 A.2d 931, 935 (Pa. 1982). When assessing the sufficiency of the evidence, a reviewing court "may not weigh the evidence

26

and substitute [its] judgment for that of the fact-finder." Commonwealth v. Vetrini, 734 A.2d 404, 407 (Pa. Super. 1999)

"Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered." Commonwealth v. Hutchinson, 947 A.2d at 806. "Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." Id.

### B.  Specific Offenses

#### 1.  Unlawful Contact with a Minor

A person commits the offense of unlawful contact with a minor, in pertinent part:

> if the person is intentionally in contact with a minor ... for the purpose of engaging in an activity prohibited under any of the following, and either the person initiating the contact or the person being contacted is within this Commonwealth:
>
> (1) Any of the offenses enumerated in Chapter 31 (relating to sexual offenses).

18 Pa.C.S. § 6318(a)(1).

The requisite "contact" of the offense pertains to "communication," not physical contact:

> [T]he crime of Unlawful Contact with a Minor focuses on communication, *verbal or non-verbal*, and does not depend upon the timing of the communication. Thus, it matters not whether the communication occurred at the outset of or contemporaneously with the contact; once the communicative message is relayed to a minor, the crime of unlawful contact is complete. Thus, the statute is best understood as "unlawful *communication* with a minor," for by its plain terms, it prohibits communication with a minor for the purpose of carrying out certain sex acts.

Commonwealth v. Davis, 225 A.3d 582, 587 (Pa. Super. 2019) (emphasis in original).

2. Indecent Assault

A person is guilty of indecent assault, in pertinent part: "if the person has indecent contact with the complainant … for the purpose of arousing sexual desire in the person or the complainant and … the person does so without the complainant's consent." 18 Pa.C.S. § 3126(a)(1). "Properly construed, the statute provides that if *any* part of a victim's body is brought into contact with a sexual or intimate part of the defendant's body, without the victim's consent, for the purpose of arousing or gratifying the sexual desire in either person, such contact constitutes indecent contact." Commonwealth v. Grayson, 549 A.2d 593, 596 (Pa. Super. 1988) (emphasis in original). "Likewise, if a sexual or intimate part of the victim's body is brought into contact with *any* part of the defendant's body, without the victim's consent, for the purpose of arousing or gratifying the sexual desire in either person, such contact constitutes indecent contact." Id. (emphasis in original).

3. Corrupting the Morals of Minor

The crime of corrupting the morals of a minor is defined, in relevant part, as follows:

> Whoever, being of the age of 18 years and upwards, by any course of conduct in violation of Chapter 31 (relating to sexual offenses) corrupts or tends to corrupt the morals of any minor less than 18 years of age, or who aids, abets, entices or encourages any such minor in the commission of an offense under Chapter 31 commits a felony of the third degree.

18 Pa.C.S. § 6301(a)(1)(ii).

The offense entails actions that would offend "[t]he common sense of the community, as well as the sense of decency, propriety and the morality which most people entertain." Commonwealth v. Pankraz, 554 A.2d 974, 977 (Pa. Super. 1989) (quoting Commonwealth v. Randall, 133 A.2d 276, 280 (Pa. Super. 1957)).

28

## C.    Application

Applying the foregoing, the evidence plainly was sufficient to sustain Defendant's convictions. The evidence established that Defendant repeatedly communicated with V.E., both verbally and in writing, for the purpose of engaging in prohibited acts (sexual contact) with his minor victim. Further, the evidence established that on numerous occasions, Defendant fondled and touched V.E. inappropriately for his own sexual gratification and without her consent. Among other things, Defendant asked V.E. for hugs, pulled her onto his lap, fondled her breasts and buttocks, spanked her, and licked her neck. As such, the evidence amply supported each of Defendant's convictions. Cf. Commonwealth v. Leatherby, 116 A.3d 73, 80 (Pa. Super. 2015) (evidence supported convictions for unlawful contact with a minor, indecent assault and corrupting the morals of a minor, where the defendant communicated with the complainant for the purposes of sexual contact and subsequently fondled her private parts; the complainant testified that defendant was in the bathroom and "told [her] to come here" and then "told [her] to give him a hug" before rubbing her private areas and trying to pull up her skirt).

In sum, even if Defendant had properly presented a sufficiency challenge, he would be due no relief.

## V.    CONCLUSION

Based on the reasons set forth in the foregoing Opinion, the Court's judgment of sentence should be affirmed.

BY THE COURT:

DATE: 3/1/24

DONNA WOELPPER, J.

29